1

2

3

4

5

6

7

8                           **UNITED STATES DISTRICT COURT**

9                           **CENTRAL DISTRICT OF CALIFORNIA**

10

11  MARK MEGLIORINO,                )   NO. CV 11-07895 SS
                                    )
12               Plaintiff,         )
                                    )
13          v.                      )
                                    )   **MEMORANDUM DECISION AND ORDER**
14  MICHAEL J. ASTRUE,              )
    Commissioner of the Social      )
15  Security Administration,        )
                                    )
16               Defendant.         )
    _____)

17

18                                  **I.**

19                             **INTRODUCTION**

20

21      Mark Megliorino ("Plaintiff") brings this action seeking to

22  overturn the decision of the Commissioner of the Social Security

23  Administration (hereinafter the "Commissioner" or the "Agency") denying

24  his application for Supplemental Security Income benefits ("SSI").  The

25  parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction

26  of the undersigned United States Magistrate Judge.  For the reasons

27  stated below, the decision of the Agency is AFFIRMED.

28

**II.**

**PROCEDURAL HISTORY**

Plaintiff filed an application for SSI on August 15, 2008. (Administrative Record ("AR") 170-75). He alleged a disability onset date of January 1, 2003. (AR 170). The Agency initially denied this claim on June 4, 2009. (AR 82).

On June 26, 2009, Plaintiff filed a written request for hearing. (AR 107). Plaintiff testified at a hearing held on September 21, 2010, before Administrative Law Judge ("ALJ") Philip J. Simon. (AR 42-74). On November 4, 2010, the ALJ issued a decision denying benefits. (AR 11-21).

Plaintiff sought review of the ALJ's decision before the Appeals Council, which denied his request on August 25, 2011. (AR 1-4). Thus, Plaintiff commenced the instant action.

**III.**

**FACTUAL BACKGROUND**

Plaintiff was born on September 9, 1966. (AR 358). Prior to his alleged disability onset date, Plaintiff worked as a warehouse order selector from 1992 to 1997 and as a cashier from 1998 to 1999. (AR 47-51). Plaintiff testified that he did some temporary work in 2009, but only for "one or two days." (AR 46-47).

Plaintiff testified that he used heroin in the past but he had "cleaned up himself" three or four years prior to his 2010 hearing. (AR 60). Plaintiff also testified that he had been "clean and sober" since 2007 and had never had any heroin relapses. (AR 61-62). However, both Plaintiff's annual assessment update in 2009 of his psychiatric condition and a follow-up medication report from the same hospital on June 5, 2009 suggested that Plaintiff "at times relapsed in heroin." (AR 547, 600). Plaintiff later noted that he would not call them "relapses".[1] (AR 62-63).

**A.  Plaintiff's Medical History**

Plaintiff stated in his Disability Report that he sought treatment at the Glendale Adventist Medical Center for gunshot wounds from February to May of 1991. (AR 199). Plaintiff had surgery on his stomach and legs. (Id.). From September 2005 to July 17, 2008, Plaintiff sought treatment at the "All For Health, Health For ALL" for osteoarthrists and pain in his legs and knees. (See AR 198-99). Plaintiff started taking medications for muscle relaxation, headaches and a sleep disorder. (See AR 199, 201).

Throughout 2005 to 2009, Plaintiff also sought treatment at the LAC/USC Medical Health Care Network for "lead poisoning, multiple shots in knees, bones and stomach," and "pain in legs" due to "arthritis and

---

[1]  In the consultative doctor's report, the doctor noted that Plaintiff began his heroin use at age 31. He admitted to daily heroin use for a period of time. He denied other drug use. (AR 362).

3

gunshot wounds." (AR 200, 250). Plaintiff received physical examinations at times, took medications and physical therapy to treat the pain and had a "steroid injection" in his left knee on June 22, 2009. (AR 200, 250, 535). The medical record noted that Plaintiff had "immediate relief of some of his knee pain" after the injection, and there is no medical record showing any follow-up treatment of Plaintiff's knees. (AR 535-41). Plaintiff received a CT study in July 2009, which only revealed "mild disc protrusions" with no evidence of nerve root or spinal cord involvement. (AR 536-37).

Plaintiff has received treatment at the Northeast Mental Health Center since May 19, 2008. (AR 337-49). Plaintiff complained that he had "depressed mood, uncontrollable crying, nightmares of violent and past traumatic events, [and] intrusive thoughts of death." (AR 338). Dr. Yee conducted an initial assessment of Plaintiff on June 18, 2008. (See AR 338-43). According to Dr. Yee's diagnosis, Plaintiff suffered from bipolar disorder and major depression without psychotic features. (AR 343). Dr. Yee noted that the diagnosis was based on Plaintiff's "self report." (Id.). Another doctor conducted an "Annual Assessment Update" for Plaintiff on June 30, 2009. (AR 600-05, 569-71). The assessment noted that Plaintiff had been suffering from "increasingly repeating auditory hallucinations." (AR 569). The doctor concluded in the updated diagnosis that Plaintiff had major depression with psychotic features and a post-traumatic stress disorder. (AR 569). Dr. Yee, in the Mental RFC Questionnaire, checked-off lines indicating that Plaintiff had "marked limitation" to maintain "attention and concentration for extended periods," to "get along with coworkers or

4

peers without distracting them or exhibiting behavioral extremes," and to "tolerate normal level of stress."  (AR 589-90).

Throughout 2008 to 2010, the main treatment Plaintiff received consisted of medications and counseling.  (AR 200, 250).  Dr. Yee maintained Plaintiff's therapy records from 2008 to 2010, which showed that Plaintiff's response to psychotropic medications had mostly been "good," and that his psychiatric condition was "stable." (See AR 547, 549-50, 557-59, 561-63, 565-68, 593-97).

B.    **Consultative Evaluations**

    1.    **Psychiatric Evaluations**

On April 28, 2009, David Bedrin, M.D. ("Dr. Bedrin"), performed a complete psychiatric evaluation of Plaintiff.  (See AR 359-65).  Dr. Bedrin reported that the "Diagnosis by DSM-IV" showed that Plaintiff had bipolar disorder, a history of alcohol abuse, and a diagnosis of "opioid abuse currently in remission."  (AR 364-65).  Dr. Bedrin reported that Plaintiff's recent memory was impaired and his intellect was below average.  (Id.).  Dr. Bedrin noticed that Plaintiff used a cane in his right hand for walking.  (AR 363).  Plaintiff stated that he used the cane all the time because of his weak knees.  (Id.).

However, Dr. Bedrin also observed that Plaintiff was alert, cooperative, clean, neat, pleasant and relaxed individual with "no acute distress" or "any bizarre posturing and mannerisms."  (AR 363).  Dr.

Bedrin noted that Plantiff's speech was fluent without "pressure or retardation." (Id.). In the interview, Plaintiff denied suicidal intent. (Id.). Dr. Bedrin also reported that Plaintiff's "judgment and insight were good." (AR 364). Dr. Bedrin concluded that although Plaintiff might have impairments in his ability to perform complex tasks, he could do simple tasks, "perform work activities on a consistent basis" and "complete a normal workday without interruption resulting from his psychiatric condition." (AR 365). Dr. Bedrin also concluded that Plaintiff was able to "interact with coworkers and the public," and able to "deal with stresses encountered in competitive work." (Id.).

**2.   Internal Medicine Evaluations**

On April 28, 2009, Dr. A. Rahman Khaledy ("Dr. Khaledy") performed a complete internal medicine evaluation of Plaintiff. (AR 351-58). For the functional assessment, Dr. Khaledy found that Plaintiff could "lift or carry 100 pounds occasionally and 50 pounds frequently." (AR 355). Further, Dr. Khaley found that Plaintiff could "stand/work for 6 hours in an 8-hour day and sit for 6 hours in an 8-hour day with normal breaks." (Id.). Dr. Khaley found that, Plaintiff did not "need any assistive device or cane for short distance walking." (Id.).

Dr. Khaley reported that Plaintiff could sit or rise up out of a chair without difficulty, and that "[t]here was no apparent ataxia or dyspnea noted." (AR 351). Dr. Khaley reported that the examination of Plaintiff's back revealed no limited movement, and that the "range

of motion is intact with flexion." (AR 353). In the "straight leg raising" test, Plaintiff's could raise his legs to ninety degree in both the seated and supine positions. (See id.). Dr. Khaley noted that the examination with Plaintiff's knees showed a "a sign of mild osteoarthristis," but the range of motion was still intact with "flexion and extension and within normal limits." (AR 354). Dr. Khaley also noted Plaintiff had "status-post gunshot wound with pellets inside [his] knee and back." (AR 355).

## C.  **Vocational Expert's Testimony**

Elizabeth G. Ramos ("Ms. Ramos"), a vocational expert, submitted a vocational analysis report on June 4, 2009. (See AR 231-33). In the report, she determined that Plaintiff could not perform his past jobs as a retail sales clerk or as an order filler, because the two professions were "semiskilled." (AR 21, 231). She also determined that Plaintiff could perform "other work" such as collator operator, cleaner and photocopy operator. (See AR 232-33).

Ms. Ramos also testified at Plaintiff's 2010 hearing. (See AR 70-74). After she listened to Plaintiff's testimony, Ms. Ramos determined that Plaintiff's actual jobs in the past were store cashier at Interstate Brands Weber Breads, and warehouse order selector. (AR 71). Ms. Ramos classified store cashier as an "unskilled" job performed "in the light exertional range," and warehouse order selector as an "unskilled" job performed "in the medium exertional range." (Id.). Ms. Ramos testified that a hypothetical individual in Plaintiff's vocational

profile and RFC would be able to do the job of store cashier, and would not be able to do the warehouse order selector, which requires "frequent stooping and crouching." (AR 71-72). She also testified that a hypothetical individual with Plaintiff's physical restrictions, but with "marked limitations in the area of sustained concentration and persistence," would not be able to perform the past job of store cashier or any "unskilled job in the general economy." (AR 72-73).

**D. <u>Lay Witness Testimony</u>**

On February 17, 2009, Cecilia Betancourt ("Betancourt"), who resided with Plaintiff, submitted a third party function report. (<u>See</u> AR 212-19). Betancourt reported that Plaintiff had difficulty sleeping due to his depression. (AR 213). Betancourt stated that Plaintiff needed reminders to take care of his "personal hygiene" and to take medications. (AR 214). Betancourt also wrote that "because of [his] physical disability, depression and voice[s] heard," Plaintiff could not "go around very well." (AR 215). Betancourt reported that Plaintiff had to rest for five to ten minutes after walking one or two blocks. (AR 217).

On September 14, 2010, Betancourt submitted an additional third party statement. (<u>See</u> AR 276). In this correspondence, Betancourt reported incidents that had occurred since Plaintiff had been living with her and her husband. (<u>See id.</u>). According to Betancourt, Plaintiff once attempted to commit suicide by making a "noose" to hang

himself.   (See id.).   Plaintiff also tried to "cut his wrist with a knife."  (Id.).

**E.   Plaintiff's Testimony**

At the 2010 hearing, Plaintiff testified that he stopped working because he could not focus and heard "voices". (AR 52).  Plaintiff stated that those voices told him to hurt himself "most of the time." (Id.).  Plaintiff testified that he had burned himself, and attempted to commit suicide by "making a noose to hang himself."  (AR 52-53). Plaintiff testified that he had "a bad problem with people," and that he felt like "they're out to get me" when a lot of people were around him.  (AR 52).  Plaintiff testified that because of the medications he took for his mental problems, he had "dry mouth," drowsiness, stomach cramps, rapid heart rate, and became "nervous and paranoid and fatigued."  (AR 54).  Plaintiff testified that he had pain in his knees and back.  (AR 56).  Plaintiff testified that he could only walk a block and had to "stop and rest."  (AR 57).  Plaintiff testified that his psychiatric condition had become much worse in 2009, and that he had "more trouble these days focusing and concentrating."  (AR 63). Plaintiff testified that he had "no interest in anything" and felt "run-down," and that he did not want to leave the house.  (AR 53, 63).

# IV.

## THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[2] and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. § 416.920. The steps are:

(1)   Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

(2)   Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.

(3)   Does the claimant's impairment meet or equal the requirements of any impairment listed at 20 C.F.R. Part

---

[2]   Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. § 416.910.

404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)   Is the claimant capable of performing h[er] past work? If so, the claimant is found not disabled.  If not, proceed to step five.

(5)   Is the claimant able to do any other work? If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); 20 C.F.R. § 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante, 262 F.3d at 953-54.  If, at step four, the claimant meets her burden of establishing an inability to perform the past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's RFC, age, education and work experience.  Tackett, 180 F.3d at 1100; 20 C.F.R. § 416.920(g)(1).  The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids").  Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).  When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000).

11

**V.**

**THE ALJ'S DECISION**

The ALJ noted that Plaintiff had previously filed an application for SSI on December 20, 2007.  (AR 11).  ALJ Joel Martinez denied Plaintiff's prior application after determining that Plaintiff "remained capable of performing other work" existing in significant numbers in the general economy.  (AR 11, 93-94).  In reviewing the second application, the ALJ followed the Ninth Circuit's decision in <u>Chavez v. Brown</u>, 844 F.2d 691 (9th Cir. 1988), which applied principles of res judicata to social security benefit determinations.  <u>Chavez</u> held that absent a material change of circumstances indicating a greater disability, a prior ALJ's finding of non-disability controls subsequent administrative decisions.  <u>Id.</u>  In the present case, the ALJ found that Plaintiff rebutted the presumption and that there had been changes of circumstances.  (AR 12).  Plaintiff showed "new impairments" resulting in a material change in Plaintiff's RFC.  (<u>Id.</u>).  Accordingly, the ALJ concluded that he was not bound by the prior findings in their entirety. (<u>Id.</u>).

The ALJ then employed the five-step sequential evaluation process and concluded that Plaintiff was not disabled under the Social Security Act.  (AR 15-21).  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2003.  (AR 15).  At step two, the ALJ found that Plaintiff had the following severe impairments: "status-post gunshot wounds, with residual fragments remaining in the body; status-post arthroscopic surgery on the right

12

knee; disc protrusion at multiple levels of the lumbosacral spine, with sacralization; polysubstance abuse; and a bipolar disorder." (Id.).

At the third step, the ALJ found that the severe impairments at step two did not meet or medically equal a listed impairment. (AR 16). At step four, the ALJ found that Plaintiff had the following RFC:

> [Plaintiff] has the residual functional capacity to lift and carry 50 pounds occasionally and 25 pounds frequently; and sit, stand, walk without significant limitation. In addition, [Plaintiff] is precluded from climbing ropes, ladders, and scaffolds, but may perform other postural activities occasionally. He has no other significant physical limitation, except that he must avoid workplace hazards such as dangerous machinery and unprotected heights. Mentally, [Plaintiff] remains limited to simple tasks.

(AR 16). The ALJ then found that Plaintiff could return to his past work as a cashier. (AR 21). The ALJ relied on the testimony of Ms. Ramos, the vocational expert ("VE"). (Id.). Ms. Ramos testified that "an individual of [Plaintiff's] age, education, vocational profile and with the above residual functional capacity would remain capable of performing the claimant's past work as a cashier." (Id.). Because the ALJ found that Plaintiff could perform his past work, he concluded that Plaintiff was not disabled. (Id.).

**VI.**

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720. It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21.

**VII.**

**DISCUSSION**

Plaintiff contends the ALJ erred for the following two reasons: (1) "[t]he ALJ failed to properly consider Plaintiff's testimony and make

14

proper credibility findings," (Memorandum in Support of Plaintiff's Complaint ("Complaint Memo.") at 5); (2) "[t]here is a DOT inconsistency in the ALJ's holding that Plaintiff can perform the job of cashier." (id. at 2). The Court finds that Plaintiff's claims lack merit. For the reasons discussed below, the Court finds that the ALJ's decision should be AFFIRMED.

A.    **The ALJ Provided Clear And Convincing Reasons For Rejecting Plaintiff's Subjective Symptom Testimony**

Plaintiff's first claim is that the ALJ failed to make proper credibility findings regarding his subjective symptom testimony. (See Complaint Memo. at 5). Plaintiff contends that the ALJ "did not provide clear and convincing reasons for rejecting Plaintiff's testimony" regarding his subjective symptoms of severe depression, hearing voices and suicidal thoughts. (Id. at 7). The Court disagrees.

To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis. See Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007). First, the ALJ must determine whether the claimant "has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Id. (internal quotation marks omitted). The claimant, however, "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably

15

have caused some degree of the symptom." Id. (internal quotation marks omitted).

Second, if the claimant meets this first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." Smolen, 80 F.3d at 1281. Moreover, the ALJ may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged is not supported by objective medical evidence. See Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir. 1991). "In weighing a claimant's credibility," the ALJ may consider the "inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work records, and testimony from physicians and third parties concerning the nature, severity and effect of the symptom of which he complains." Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997).

Here, the ALJ found that Plaintiff had provided objective medical evidence of psychiatric impairments. (See AR 17-18). However, the ALJ rejected Plaintiff's symptom testimony because the ALJ had "serious concerns" about the reliability of Plaintiff's psychiatric treatment evidence and because he found inconsistencies between Plaintiff's testimony and other evidence in the record. (See AR 17-20). Specifically, the ALJ stated "I have serious concerns regarding the reliability of [the psychiatric] evidence and the claimant's psychiatric claims, generally." (AR 18),

16

The ALJ supported his finding with clear and convincing reasons for rejecting Plaintiff's credibility. First, the ALJ found an inconsistency in Plaintiff's claims regarding his use of drugs. (AR 19). At the hearing before the ALJ in 2010, Plaintiff "categorically denied" heroin relapses. (AR 19; 61-62). However, this testimony directly contradicts Plaintiff's treating psychiatrist's reports in 2008 and 2009, which indicate that Plaintiff "relapsed on heroin." (AR 547, 600); see Thomas v. Barnhard, 278 F.3d 947, 959 (9th Cir. 2002) (finding that Plaintiff's lack of candor in drug use discredits her description of physical pain).

Second, the ALJ noted that Plaintiff had not demonstrated a strong commitment to work. For example, Plaintiff alleged that he became disabled in 2003, but he had not even in the years prior to that date. (See AR 20; 47-51; 170); see Thomas, 278 F.3d at 959 (holding that Plaintiff's poor work history negatively affected her credibility regarding her inability to work).

Third, the ALJ noted that Plaintiff informed the state agency examining psychiatric consultant in 2009 that he had been suffering from depression since "the mid 1990s," and had visual and auditory hallucination for "about two or three years." (AR 18, 359-60). However, there is no evidence that Plaintiff received any psychiatric treatment until days before he filed his current SSI application in 2008. (See AR 18, 337-49); see, e.g., Bruton v. Massani, 268 F.3d 824, 828 (9th Cir. 2001) (finding that Plaintiff's failure to seek treatment

despite complaints of severe pain is a legitimate reason for the ALJ to reject Plaintiff's pain testimony).

Fourth, the ALJ found that although the medical records indicated that Plaintiff had some difficulty in maintaining focus and communicating with people and that he suffered from depression, the medical records were not entirely reliable, because other facts in the record contradicted some of the statements in Plaintiff's medical documents. (See AR 18-19, 52, 63, 589-90).

The ALJ noted that the limitations suggested in Plaintiff's psychiatric treatment records were directly contradicted by the examining consultant's findings. (AR 19). Plaintiff's treating psychiatrist, Dr. Yee, concluded in the Mental RFC Questionnaire that Plaintiff had "marked limitation" in the ability to maintain attention and concentration for extended periods, complete a normal work-day without interruptions from psychologically-based symptoms, and to tolerate normal level of stress. (See AR 589-90). However, the examining consultant, Dr. Bedrin, reached a different conclusion. (See AR 359-65). Dr. Bedrin concluded in his independent evaluation that Plaintiff was able to "maintain regular attendance in the work place," "complete a normal workday without interruptions resulting from his psychiatric condition" and "deal with the usual stresses encountered in competitive work." (AR 365).

The ALJ provided specific and legitimate reasons supported by substantial evidence to reject Plaintiff's treating physicians'

opinions.  (AR 18-19).  The ALJ found an inherent inconsistency in Plaintiff's psychiatric diagnosis and his therapy records, i.e., that Plaintiff's degree of treatment was far too minimal for someone with his alleged impairments.  (See AR 19).  Plaintiff's "Annual Assessment Update" in 2009 suggested that after a year's treatment, Plaintiff's depression was more severe and Plaintiff had been suffering from "increasingly repeating auditory hallucinations."  (AR 600, 569). Plaintiff's treating doctors further suggested in 2010 that Plaintiff suffered from bipolar and schizoaffective disorder and severe depression.  (AR 606).  However, Plaintiff's therapy records from 2008 to 2010 showed that Plaintiff's response to psychotropic medications had mostly been "good," and that his psychiatric condition had always been "stable."  (See AR 547, 549-50, 557-59, 561-63, 565-68, 593-97).  In addition, the ALJ pointed out the treating physicians' statement that Plaintiff had schizoaffective disorder was not supported by any diagnosis or treatment in the record.  (See AR 592-606).  The ALJ also noticed that Plaintiff's treating doctors conducted their diagnosis largely based on Plaintiff's "self report" and did not consider the possibility that Plaintiff might be exaggerating his symptoms.  (AR 343, 19-20).  Therefore, the ALJ properly discounted the weight of Plaintiff's psychiatric treatment records.

Another inconsistency in the record that supported the ALJ's rejection of Plaintiff's testimony was the statements regarding his use of a cane.  During the consultative psychiatric examination, Plaintiff presented using a cane and claimed that he used it all the time for walking.  (See AR 19, 363).  However, there was no mention of the cane

19

in the internal medicine examination on the same day. (See AR 350-55). Also, the internal medicine report suggested that Plaintiff did not "need any assistive device or cane for short distance walking," and that Plaintiff's gait was "within normal limits." (AR 354, 355). Nor is there any indication in Plaintiff's treating records that Plaintiff needed to use a cane. (See AR 572-84, 326-36).

Plaintiff's representations regarding suicide attempts were also inconsistent. Plaintiff testfied that he had attempted to commit suicide. (AR 19, 53). Betancourt, the third party, also reported that Plaintiff had attempted to commit suicide twice since Plaintiff moved into her house. (See AR 276). However, Plaintiff denied any "suicidal or homicide intent" during the psychiatric examination with Dr. Bedrin. (AR 363). Moreover, there was no police report, emergency room record, or any suggestion of these suicide attempts in Plaintiff's psychiatric treatment records. (See AR 19, 337-49, 551-71, 592-605). The complete absence of documentation to show these alleged suicide attempts took place reasonably led the ALJ to doubt Plaintiff's testimony on this topic.

Thus, the Court concludes that the ALJ provided clear and convincing reasons for rejecting Plaintiff's subjective symptom testimony. Indeed, the ALJ found that Plaintiff's psychiatric medical records were unreliable and that there were inherent inconsistencies between Plaintiff's testimony and other evidence in the record. Accordingly, no remand is required.

**B.    The ALJ Properly Determined That Plaintiff Could Perform His Past Relevant Work**

Plaintiff claims that the ALJ erred when he concluded that Plaintiff could perform his past relevant work as a cashier.  (See Complaint Memo at 2).  Specifically, Plaintiff contends that he is unable to perform his past work as a cashier because it requires Reasoning Level 3 and the ALJ found that Plaintiff could only perform simple tasks.  (See id. at 2-3).

Social Security Ruling 96-8p defines a claimant's RFC as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  The term "regular and continuing basis" is further defined as meaning "8 hours a day, for 5 days a week, or an equivalent work schedule."  Id.  "In determining residual functional capacity, the ALJ must consider subjective symptoms such as fatigue and pain."  Smolen, 80 F.3d at 1291 (citing Social Security Ruling 88-13 and 20 C.F.R. § 404.1529(d)).

Here, the ALJ limited Plaintiff to the performance of "simple tasks."  (AR 16).  The ALJ determined that Plaintiff was capable of performing past relevant work as a cashier.  (AR 21).  In making this determination, the ALJ relied on the VE's testimony, which compared Plaintiff's age, education, vocational profile and RFC with the demands of the job, and found that Plaintiff was able to perform his past work as a cashier.  (AR 21, 70-72).

Plaintiff argues that according to the Dictionary of Occupational Titles ("DOT"), the job of a cashier requires the "ability to compute totals, make changes, cash checks, know value and features of items for which money is received, keep track of money and financial information, and deal with clients." (Complaint Memo at 3). Plaintiff further argues that such a job is not simple and requires "Reasoning Level 3," which directly conflicts with Plaintiff's limitation to simple tasks. (Id. at 4). Therefore, Plaintiff argues that the ALJ's decision is inconsistent with the DOT's description of cashier. (Id. at 2).

The regulations provide that DOT classifications provide a rebuttable presumption regarding certain jobs and require that the ALJ take notice of DOT's classifications. 20 C.F.R. § 404.1566(d). The ALJ must first determine if a conflict between the DOT and VE's testimony exists; then he must determine whether the VE's explanation for the conflict is reasonable and whether a basis exists for relying on the VE rather than DOT. Massachi v. Astrue, 486 F.3d 1149, 1153 (9th Cir. 2007).

In Leon v. Astrue, 830 F. Supp. 2d 844 (C.D. Cal. 2011), the court noted that there is no clear Ninth Circuit precedent on the issue of whether Reasoning Level 3 is consistent with an RFC limitation to simple tasks. The Seventh and Eighth Circuit have both held that, depending on the circumstances, a claimant limited to simple, repetitive work may be able to perform Reasoning Level 3 work. See, e.g., Terry v. Astrue, 580 F.3d 471, 478 (7th Cir. 2009) (noting that because plaintiff finished high school and because plaintiff did not identify any conflict

between DOT and VE's testimony at hearing, ALJ correctly concluded that, although plaintiff was limited to "simple" work, she could perform work with Reasoning Level 3); Hillier v. Soc. Sec. Admin., 486 F.3d 359, 367 (8th Cir. 2007) (holding that Hillier's past work experience as a cashier, absent any evidence showing any mental deterioration since then, demonstrated he had mental capacity to return to previous job). However, the Tenth Circuit has concluded that Level Three reasoning is inconsistent with a limitation on simple and routine work. See, e.g., Hackett v. Barnhard, 395 F.3d 1168, 1176 (10th Cir. 2005) (holding that ALJ erred in step-five analysis by concluding Plaintiff could do the jobs identified by VE which requires Reasoning Level 3); Leon, 830 F. Supp. 2d at 850 (holding that ALJ correctly concluded in step-four analysis that Plaintiff could return to his previous job as a cashier because Plaintiff's counsel did not identify conflict between DOT and VE's testimony at administrative hearing, Plaintiff did this job before and had a college education, and Plaintiff did not present any evidence that she could not perform this job now).

Here, the Court concludes that Plaintiff's RFC limitations do not conflict with the DOT reasoning requirements. First of all, similar to Leon and Hillier, the ALJ's conclusion that Plaintiff could perform his past work as a cashier occurred at step-four of the analysis. See Hillier, 486 F.3d at 367; Leon, 830 F. Supp. 2d at 850. At step four, Plaintiff had the burden of establishing that he could not perform this job. Bustamante, 262 F.3d at 953-54. Plaintiff performed this job before and did not provide sufficient evidence that he could not perform this job now. Although Plaintiff stated to the examining consultant,

23

Dr. Bedrin, that he had been suffering from depression since the mid 1990s, Plaintiff had performed the cashier job during 1998 and 1999. (See AR 359, 47-51). This suggests that even with symptoms of depression, Plaintiff had the mental capacity to perform the cashier job. Moreover, although Plaintiff testified that his psychiatric condition had deteriorated in recent years, this Court has concluded that the ALJ correctly discredited Plaintiff's testimony regarding his subjective symptoms. (See AR 18-19, 52, 63, 589-90). Thus, there is insufficient evidence in the record to demonstrate that Plaintiff's mental status has changed such that he cannot perform the work he previously performed. If anything, now that Plaintiff is receiving treatment and there is evidence of improvement from treatment, he should be able to do work that he previously did while not receiving treatment.

Moreover, as in Leon and Terry, Plaintiff's counsel did not identify any conflict between the DOT and VE's testimony at the hearing before the ALJ. (See AR 73); see Terry, 580 F.3d at 478; Leon, 830 F. Supp. 2d at 850 (holding that Plaintiff's counsel had an obligation to identify the inconsistency at the hearing so that ALJ could have resolved the issue during the administrative proceedings). Therefore, the ALJ was entitled to rely on the VE's testimony to conclude Plaintiff could return to his past work. See Bayliss, 427 F.3d at 1217.

In sum, the Court concludes that the ALJ properly determined that Plaintiff could perform his past relevant work as a cashier. Accordingly, no remand is required.

24

# VIII.

## CONCLUSION

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[3] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner.  IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

Dated: July 10, 2012

```
                                    /S/
                              _____
                              SUZANNE H. SEGAL
                              UNITED STATES MAGISTRATE JUDGE
```

---

[3]  This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

25